———————

GIDDINGS et al. v. FREEDLEY et al.

(Circuit Court of Appeals, Second Circuit. January 6, 1904.)

No. 53.

1. FIXTURES—BELTING IN MILL.

A leather belt, which transmits the power from a stationary engine to a main shaft for the operation of the machinery of a marble mill, is a part of the realty, and is not subject to attachment and removal as personal property.

2. TRIAL—EXCEPTIONS TO CHARGE.

Where a single exception to a charge covers several distinct propositions, it is inoperative if any one of the propositions is sound.

3. WRONGFUL ATTACHMENT—EXEMPLARY DAMAGES—MALICE IMPUTABLE TO OFFICER.

Where officers, having in their hands for service a writ of attachment for $12,000, at the instance of the attachment plaintiff seized and removed only the main belt in a marble mill, worth not to exceed $20, but the effect of which was to stop the operation of the mill, when there was unincumbered real and personal property belonging to the defendant and subject to attachment sufficient in value to satisfy the writ, a jury is justified in imputing to them the malicious intent of the attaching plaintiff, and in awarding exemplary damages against them in an action for the trespass.

4. SAME.

Officers who, by the wrongful and illegal execution of a writ of attachment, stop the operation of machines, may be subjected to the payment

¶ 4. See Sheriffs and Constables, vol. 43, Cent. Dig. § 307.

of damages for the loss of use of such machines, and it is no defense that in the lawful execution of the writ they might have seized and removed the machines.

In Error to the Circuit Court of the United States for the District of Vermont.

This cause comes here upon writ of error to review a judgment of the Circuit Court, district of Vermont, against the plaintiffs in error, who were defendants below. The action is for trespass, and the judgment was entered upon verdict of a jury in favor of defendants in error for $996. The facts sufficiently appear in the opinion.

For opinion below, see 119 Fed. 438.

James L. Martin, for plaintiffs in error.
F. M. Butler, for defendants in error.

Before LACOMBE and TOWNSEND, Circuit Judges, and HOLT, District Judge.

LACOMBE, Circuit Judge. The plaintiffs, citizens and residents of Pennsylvania, owned a marble mill operated by steam, and a quarry connected therewith, all in Dorset, Vt. On April 8, 1902, a writ of attachment in favor of one Gilman B. Wilson, of Dorset, against the senior plaintiff, William G. Freedley, was duly issued, in which the ad damnum was $12,000. This writ was seasonably placed in the hands of defendant Giddings, of Manchester, a constable having authority to serve the same. Under the laws of Vermont, such an attachment can be served upon real property only by delivering a true and attested copy of such attachment, with a description of the estate attached, to the party whose estate is so attached (or leaving same at his place of abode), and by filing the same in the office where by law a deed of such real estate is required to be recorded. In Dorset such office would be that of the town clerk. In the case of personal property the writ of attachment may be executed in either of two ways. The officer serving the process may lodge a copy of the same, with his return, in the town clerk's office, "which lodgement shall hold the property against all subsequent sales, attachments, or executions, as if it had been actually removed and taken into the possession of the officer." Or the officer "may remove the [personal property attached] and take it into his possession, in which case he need not leave a copy of the attachment in the * * * clerk's office." Vt. St. 1101, 1103, 1108. On April 10th Giddings went to the mill, found one Nadeau, plaintiffs' superintendent, in charge, explained to him what his business was, and showed him the writ. He told Nadeau that in order to make said attachment upon the personal property it was necessary to take possession of the mill, and asked Nadeau to assist him in getting things into shape, as he wished to take possession some time during that day. To this Nadeau assented. A memorandum was made by Giddings of the property to be attached. He made a copy of the writ, and indorsed upon it a list of the property attached by him—derricks, movable machinery, finished and unfinished marble, etc.—and arranged with Nadeau for the latter to act for him as keeper of said property. No effort was made to remove any of the personal property.

On Saturday, April 12th, Nadeau telegraphed Giddings that he wanted to be released as keeper of said property, and on the following day declined to continue as keeper, and surrendered the keys to Giddings, who had come to Dorset in response to the telegram. The latter fastened up the doors of the mill, including engine house and boiler house, by nailing strips of board across them. He removed none of the property, put no one in charge, and left it boarded up as described.

On the next day plaintiffs, without Giddings' knowledge or consent, knocked off the strips of board, entered the premises, and proceeded to operate the mill, which fact was at once made known to Giddings by Gilman S. Wilson. Giddings went again to the mill on Tuesday, April 15th, and had an interview with Nadeau. Giddings' version of the interview is that Nadeau stated he intended to hold the property by force, that he had help enough to defend it, and would throw Giddings into the brook if necessary. Nadeau denies that he said anything of the sort, although he admitted that he refused to give Giddings possession of the mill. Our attention is called to no provision of law which authorized the attaching officer to take possession of the real estate. Under the verdict of the jury, all disputed questions of fact are to be considered in this court as resolved against the defendants. The next day Giddings called on the defendant Henry S. Wilson, of Arlington, high sheriff of the county, to assist him in executing the attachment. Having consulted with a firm of lawyers, the two defendants went to the mill on April 17th, and it is their joint action on that day which is the subject of this action. Freedley and Nadeau were both present, and the mill was in operation. Giddings testified that he repeatedly requested that the mill should be shut down, and the attached property surrendered to him as attaching officer, and that upon Nadeau's continued refusal he notified him that he would shut down the mill and the main belt. Nadeau's story is that he never objected to the officers taking away or moving or taking hold of any of the personal property that was on the list, and that he told them "if they took the main belt they would have to take it by force; they would have to use force, and stop the engine themselves." Evidently the jury believed Nadeau's version to be the correct one; not unnaturally, since both officers admitted they entered the premises with the intention to remove the main belt, well knowing that would have the effect of shutting down the mill. Upon Nadeau's refusal to shut down the mill and deliver up the main belt, Giddings broke open the doors that led into the boiler room and into the engine room, and the defendant Wilson, under the direction of Giddings, then cut the lacing of the belt, and Giddings caused it to be carried away. Thereupon the officers left without removing or undertaking to remove a single item of the personal property they claimed to have attached.

The first question raised on this appeal is whether the main belt was personal property. If it were, defendants were protected by their writ; if it were not, they were trespassers.

The plant was operated by an 80 horse power steam engine and two boilers, which were located in a room attached to the mill building. The engine was set on a solid foundation of masonry, composed of

stone and brick, three or four feet high, which was called the engine bed. Underneath this bed, and resting on the earth, were anchor stones to which the engine was fastened by iron rods running through the bed, and through the anchor stones, for the purpose of holding the engine immovable on its bed. The engine was connected with the main line shaft by the main belt, above referred to. This was a double leather belt, 24 inches in width and several feet in length. It extended from the drive wheel of the engine to a pulley on the main line shaft. The engine had no fly wheel or balance wheel. The belt is the sole means by which power generated on the engine shaft is transmitted to the main shaft, which latter is the immediate source of power on which the various and steam-driven machines and working devices are entirely dependent for their operation.

The question is to be determined not as it would be under the rules which public policy requires to be laid down when a tenant, for the use of his own business, has put mechanical appliances in his landlord's building, but under the rules which apply as between vendor and purchaser. In Newhall v. Kinney, 36 Vt. 591, the court held that "a levying creditor, in the eye of the law, is a purchaser of the property set off to him in satisfaction of his debt against the judgment debtor," and that an attachment of the debtor's real estate, followed by a levy upon a "sawmill," includes a circular sawmill, which is in and constitutes a part of the sawmill. The court says:

"The simple fact that the circular sawmill might be removed, and another substituted in its place, without material injury to other parts of the building, is not determinative of whether it was intended to pass to the purchaser, or to a party who stands in the relation of a purchaser, upon a conveyance of the property. Such removal and substitution can be made of almost any other part of a sawmill, of the doors, windows, water wheel, sills, ridge pole even. But when once fitted up with these, or with a circular sawmill, the removal thereof without a substitution takes away an essential part of the sawmill, and the purchaser * * * would fail to receive the property he bargained for under the description 'sawmill.'"

The case of Kendall v. Hathaway, 67 Vt. 122, 30 Atl. 859, where a circular sawmill so attached that it could be readily removed was held to be personal property, is not in conflict with Newhall v. Kinney, because in the later case the circular sawmill was put in a building which had been erected on land already covered by a mortgage, under circumstances which the court found evidenced an intention to keep it in the building "only so long as the owners might desire." In Winslow v. Merchants' Ins. Co., 4 Metc. (Mass.) 306, 38 Am. Dec. 368, the court held that a steam engine and boilers, and all the engines and frames adapted to be moved and used by the steam engine, by means of connecting wheels, bands, or other gearing, as between mortgagor and mortgagee, are fixtures or in the nature of fixtures, and constitute a part of the realty. After pointing out that the mode of attachment is "far from constituting the criterion" by which to dispose of the question, the court says:

"The difficulty is somewhat increased when the question arises in respect to a mill or manufactory, where the parts are often so arranged and adapted, so ingeniously combined, as to be occasionally connected or disengaged, as the objects to be accomplished may require. In general terms, we think it may be said that when a building is erected as a mill, and the waterworks

or steamworks which are relied upon to move the mill are erected at the same time, and the works to be driven by it are essential parts of the mill, adapted to be used in it and with it, * * * they are parts of [the mill], and pass with it by a conveyance, mortgage, or attachment."

This case is cited ·with approval in Hill v. Wentworth, 28 Vt. 428, where the court says:

"The iron shafting put up in the building for the purpose of turning and putting in motion the machinery * * * we are disposed to regard as a constituent part of the mill. The shafting was necessary to communicate the motive power to the machinery, and should be regarded as a part of the mill as much as a water wheel by which a water power is called into existence."

To the same effect is the following excerpt from Harris v. Haynes, 34 Vt. 220: "Understanding the object and purpose of the annexation of the engine and its adjuncts to the realty to have been the furnishing of motive power to the machinery of the shop, and having reference to the manner in which they were fitted and adapted to the shop and the business carried on there, we are of opinion that" the engine and boilers, arch mouth and grate, and certain shafting and pulleys were fixtures. In Keeler v. Keeler. 31 N. J. Eq. 190, it was held that the "machinery and apparatus for furnishing motive power" were a part of the realty. "The steam engine is securely and permanently bolted to a foundation, * * * and was put in for permanent use. It, with its appurtenances, is part of the realty, and so are the boilers, which are a necessary adjunct to it; also the shafting, belting, coupling, and pulleys to communicate the power; and also the water wheels and water wheel governor." The precise question now presented was considered in Burnside v. Twitchell, 43 N. H. 394, where the court says:

"The belting also of a mill runs from the large wheel connected with the motive power over a drum upon the main horizontal shaft, upon which are various other drums, upon which are belts connected with the various distinct portions and parts of the machinery. Whether the belting could be removed whole without removing any of the machinery, or whether, as is the case ordinarily, it could not be disengaged from the drums and shafts altogether, without removing some of the permanent parts or attachments of the mill, or by disuniting the belts by removing the thongs by which the ends are usually fastened together, the case does not show. But when a mill of any kind is constructed so as to make belts necessary, in order to run the mill, they would seem to be a part and as essential a part as any other of the mill. Some gristmills are constructed in this way, with a belt attached to the main shaft and connected with each run of stones, another to the belt, another to the smutmill, etc.; others are constructed with a large cogwheel, with other smaller cogwheels, that can be thrown into it or upon it, to carry each of the other several parts of the machinery. In one case the drums and belts perform the same office that the wheels and gearing do in the other. The belting is as necessary as the drums, and both are as necessary in one case as the cogwheels are in the other, one of which might be removed, perhaps, with as little trouble as the other. Why, then, should the cogwheels be considered as a part of the mill, and the belting not be so considered?"

We are entirely in accord with these propositions, and do not find anything in the cases cited to us from the Vermont Reports which would prevent their application in the case at bar. It is conceded by defendants that the engine which supplies the motive power for the mill is real estate, and the belting by means of which such power is transmitted from the engine to the main shaft is certainly an adjunct of the engine. Without it or its equivalent the engine would

not discharge the function for which it was erected—it would not supply motive power to the mill. It would hardly be contended that if the power were transmitted by cranks, or by a pitman, or by a train of gearing, such devices were not fixtures, and there is no sound reason for reaching a different conclusion when the transmitting device is a leather belt. We conclude, therefore, that defendants had no right to seize and remove the main belt as personal property under the writ.

Defendants next assign as error that "the court did not correctly instruct the jury on the subject of exemplary damages." Reference to the brief shows that it is contended that two propositions should have been called to the attention of the jury, viz.: (a) That, "when defendant acts on the advice of counsel in the commission of the act complained of, such fact should be considered on the question of exemplary damages"; and (b) that, "where the only evidence of malice is the presumption which arises from the mere doing of an unlawful act, if it is shown that the defendant acted in good faith, and on the advice of counsel, exemplary damages are not recoverable." The trial judge was not requested to charge either of these propositions, nor, indeed, did defendants ask for any instructions whatever on that branch of the case. The court charged the jury at some length on the subject of exemplary damages, telling them that if they found the purpose was to shut down the mill instead of making a fair attachment; to oppress Freedley & Son by taking an unfair advantage of them; if defendants' action was high-handed and oppressive, and done with a wrong purpose to do damage unlawfully—the jury might add what was right to the damages by way of example. The only exception reserved to this part of the charge was "to the instructions on the question of exemplary damages, and to the instruction that exemplary damages may be recovered in this case against both defendants." The first part of this exception is too indefinite. It is not contended that the charge on this branch of the case was wholly erroneous. Manifestly no such contention could be made, for the doing of an illegal act with a wrong purpose to do damage unlawfully would certainly support a claim for exemplary damage. Where a single exception covers several distinct propositions collectively it is inoperative, if one of the propositions is sound. The defendants should have called the court's attention to the particular propositions complained of, and, if it were thought the instructions should be made fuller, have stated precisely what they wished to have charged. The exception, however, sufficiently raises the question whether the evidence warranted the jury in giving exemplary damages.

It appears that defendants had no personal acquaintance with Freedley, and had no ill will towards him. Nevertheless, if they willingly and knowingly allowed themselves to become the tools of another person, whose object was apparently malicious, and carried out an unlawful act in a high-handed and oppressive way, the jury would be entitled to find their conduct malicious, and to punish it by assessing punitive damages. The evidence quite clearly shows that this was just what they did, and we need not look beyond their own admis-

sions for proof. The real estate was valuable and unincumbered. There was personal property worth several thousand dollars. The mere filing of a copy in the town clerk's office would have effected a levy on all the property. The defendants filed no copy, and thus made no effort to secure the real estate. Out of the personal property they seized and removed only the main belt, worth less than $20. The defendant Sheriff Wilson admitted that ordinarily he would have looked up the title to the real estate and attached that by filing copy, and that in the ordinary course of serving a writ he would not have removed the main belt. The defendant Giddings had a conversation with Wilson, who sued out the attachment, and after that conversation went to the mill with the intention of removing the main belt. Both defendants took legal advice before they seized the belt, but the lawyers they consulted were the counsel of the attaching creditor, who told them to remove the belt. Both knew perfectly well that their seizure of the belt would effectually shut down the mill, and entail a loss far in excess of the $20 they secured thereby. They admit that ordinarily they do not require a bond of indemnity from the attaching creditor where there is no question as to the ownership of the property they are about to levy on, but that when the circumstances are "rather peculiar—out of the ordinary"—they do require such security. They quite wisely concluded that the circumstances of this case were rather peculiar, and before electing to seize a $20 leather belt for a $12,000 claim, instead of filing copy in the clerk's office, Giddings asked Wilson, of Dorset, for a bond of indemnity, which was given; thereupon the latter "told [him] what to do," and he did "just what he told [him]." Comment is superfluous.

Defendants reserved an exception to this excerpt from the charge:

"Freedley had a right to have his property there undisturbed except by due process of law. If this man living there [Wilson, of Dorset], thought he would oppress Freedley a little by attaching in this way, when he might have done it in another way, and not interfere with his business so, you should add whatever you think is about right."

It is contended that this instruction allowed the jury to punish defendants for the attaching creditor's wrong, when they can only be punished for their own acts. But the charge must be considered as a whole, and we are satisfied the jury could not have been misled by this part of it. It was the acts of the defendants—"peculiar and out of the ordinary"—in assisting the attaching creditor to oppress the plaintiffs, when as intelligent men they must have known his object, which were left to the consideration of the jury.

Exception was taken to instructions which allowed the jury to include damages sustained by the loss of the use of the gangs of saws, which of course could not run when the main belt no longer transmitted power to the main shaft from which (or from some subsidiary shaft) they were driven. The gangs were personal property, and could have been removed. If defendants had directed their attention to them, taken down and removed them, there could be no recovery for the loss of their use. But it would be going too far to hold that damages necessarily resulting from an unlawful act are to

be disallowed on the theory that, if defendants had kept within the limits of the law, similar damages would have ensued. They elected to act outside the limits of the law, and for the damages resulting from their unlawful act they must respond.

Exception was reserved to the admission of evidence, and its submission to the jury, showing damage to the foundation of the engine and engine bed from the sudden stopping of the engine, on the ground that such damages were not specially pleaded. The jury was charged to confine the damages to such as directly resulted from the stoppage of the engine, and the damages testified to seem to be the natural and reasonably to be expected result of the trespass complained of.

The judgment is affirmed.